# EXHIBIT 12

**Supplemental Termination for Convenience Settlement Proposal and, in the alternative, Certified Claim**

Under Contract No.:     W9124-N-10-C-0109
Contractor:     Avant Assessment, LLC
Project Name:     Test Development of Multiple-Choice Defense Language Proficiency Tests 5 (DLPT5s)
Date:     June 25, 2019

## I. Summary

Please accept this correspondence as Avant Assessment, LLC's (Avant) Supplemental Termination for Convenience Settlement Proposal resulting from the Government's termination for convenience of Contract No. W9124N-11-C-0109 (Contract 0109 or the Contract).[1]

The Armed Services Board of Contract Appeals' decision concerning the improper termination of this Contract resulted in a lack of procedural clarity with respect to the correct course of action for Avant to take after prevailing on its challenge to the default termination and subsequent dismissal of Avant's arguments under the termination for convenience standard for lack of jurisdiction. Out of an abundance of caution, and in the alternative, Avant also submits this termination settlement proposal as a certified claim under the Contract Disputes Act, 41 U.S.C. § 7103.

The Contract was one of four contracts Avant entered into with the Defense Language Institute (DLI), under which it was to deliver foreign language test items to DLI.[2] DLI originally purported to terminate the Contract for default, but retained all the foreign test items, including thousands for which Avant was never paid. DLI's retention of the items despite having "rejected" them, constituted constructive acceptance of the "rejected" items, and Avant is entitled to the monies owed on the "rejected" items.

The Government cannot improperly terminate a contract for cause, lose a subsequent lawsuit challenging that termination for cause, and then refuse to pay anything because the items subject to the contract were purportedly "rejected." Indeed, having lost on its purported termination for cause, the Government lost the ability to assert any performance-based argument on which its termination for cause was based. As a result, the Government cannot refuse to pay for "rejected" items.

---

[1] The Contract is attached as **Exhibit 1** to this Certified Claim. The Modifications (P00001–P00006) are attached as **Exhibits 2 – 7**, respectively.

[2] Contract Nos. W9124N-11-C-0040 (Contract 0040), W9124N-11-0033 (Contract 0033), W9124N-11-C-0015 (Contract 0015), and W9124N-10-C-0109 (Contract 0109). Avant files this claim and two related claims under Contract Nos. 0015 and 0033 seeking damages.

1

Under the commercial item termination for convenience clause, the Government is required to pay for the percentage of the work performed prior to the notice of termination. Here, because the Government retained the test items created by Avant and prevented Avant from recovering them, Avant is entitled to payment for those items. Avant therefore requests $5,227,428.86, representing its recoverable damages as a result of the termination and the Government's subsequent retention of the test items. **Avant requests a contracting officer's final decision with 60 days.**

Given the protracted nature of this matter, Avant provides below a summary of the underlying facts and the procedural posture that led to this point. Avant also provides case law showing it is entitled to payment for the "rejected" items which the Government retained and did not allow Avant to use.

## II.     Factual Background

The U.S. Army Mission and Installation Contracting Command (MICC or the Government) awarded the Contract to Avant for the delivery of foreign language test items. (*See* Contract 0109.) The Contract was awarded pursuant to FAR Part 12 and included FAR 52.212-4, Contract Terms and Conditions – Commercial Items (June 2010). The test items were for DLI to use in its assessment of Government personnel's foreign language skills. (Contract 0109, p. 11.)

Constructing each "test item" is a complex process that requires a team of experts with a range of special language and language assessment skills. First, for each language (under the Contract, "test items" were produced in 18 different languages and dialects) a reading or audio passage must be identified and collected from an authentic source by a highly educated native speaker of the target language at the target level of difficulty for the assignment. The passage is then rendered into English for the language testing expert to confirm the appropriateness of the content; that the passage is consistent with the specific level of the passage; and whether the passage has assessment points that can be used to create a test item.

A language testing expert then begins the creation of a test item by writing an orientation (a short English statement that sets up the test taker's expectations by saying what kind of passage it is), adding the target language passage (a passage the test taker reads or hears), creating a stem (a question about the passage for which the correct answer has to be selected from the answer choices) that is based on an assessment point in the passage that meets the requirements for topicality, level, and clarity; a key (the correct answer) that is not obvious, but can be discerned as the correct answer, and is at the appropriate level for the passage; and distractors (three incorrect answer choices) that are incorrect, but plausible, and are all at the appropriate level for the passage.

### A.     Delivery Requirements and Historical Rejection Rates

Avant and DLI entered into Contract 0109 on September 29, 2010. (Contract 0109, p. 1.) Avant based its Contract pricing on an approximation of its costs and included a reasonable profit markup. The Government accepted Avant's proposed pricing, considering it reasonable for the work to be performed.

The Contract originally required Avant deliver 3,300 "acceptable" test items, (Contract 0109, p. 52), but contemplated the possibility of some overage to account for the Government's rejection of items. (*See* Contract 0109, p. 14.) Ultimately, by December 31, 2012, Avant had submitted 8,080 items, of which DLI accepted and paid Avant for 3,174 ("rejecting" 4,906 items). (**Exhibit 8**, Contract Performance Assessment Report (CPAR)).

### B. Government Ownership Rights and Payment Terms

In general, the Contract contained language that gave the Government "sole ownership and exclusive rights to all deliverables and Government-Furnished Materials provided to the Contractor (for example, intellectual property)." (Contract 0109, p. 16.) The Contract prohibited Avant from retaining copies of any "contract deliverables or contract related materials following the delivery of contract deliverables to [the] Government" and from reusing "any of these materials for future private, public, or commercial use." (Contract 0109, p. 17.)

### C. The Terminations and the ASBCA Decisions

On June 26, 2013, DLI purported to terminate the Contract for default. (Modification P00006.) Following termination, the Government made a copy of the SharePoint site for itself—including copies of all the test items Avant delivered (specifically, the "accepted" items, the "fixable" items, and the "rejected" items). The Government retained all "rejected" items, without paying Avant.

On September 23, 2013, Avant filed an appeal before the Armed Services Board of Contract Appeals (ASBCA) seeking to convert the Government's default termination into a termination for convenience. On December 2, 2014, while Avant's 0109 termination action was pending, Avant appealed ASBCA No. 59713 concerning contract 0109, seeking money damages under a breach of contract theory. On August 11, 2015, the Board granted summary judgment in favor of Avant, converting the termination for default into one for the Government's convenience. *Avant Assessment, LLC*, ASBCA No. 58867 (Aug. 11, 2015). On September 22, 2016, the ASBCA dismissed Avant's breach of contract claim (ASBCA No. 59713) as moot (a dismissal without prejudice) based on the Board's August 2015 conversion decision and the understanding that, in the interests of convenience and economy, it made sense for Avant and DLI to negotiate and settle all outstanding matters through the termination for convenience settlement process. *Avant Assessment, LLC*, ASBCA No. 59713 (Sept. 22, 2016); *see also* FAR 49.114 ("Before settlement of a completely terminated contract, the [termination contracting officer (TCO)] shall obtain from the contracting office a list of all related unsettled contract changes. The TCO shall settle, as part of final settlement, all unsettled contract changes after obtaining the recommendations of the contracting office concerning the changes.").

Avant attempted to negotiate a settlement with DLI pursuant to FAR 52.212-4(*l*); however, DLI failed to cooperate. Ultimately, Avant declared an impasse in the parties' negotiations, which caused its termination for convenience settlement proposal to ripen into a claim under the Contract Disputes Act. Avant appealed this claim, arguing entitlement to damages under FAR 52.212-4(*l*). Avant argued that the Government constructively accepted the "rejected" test items, entitling Avant to payment under the Uniform Commercial Code (UCC) and/or that the items met the commercial item acceptance standards, entitling Avant to payment at the Contract Line

3

Item rate. On October 4, 2018, the Board dismissed these arguments for lack of jurisdiction, finding the arguments were "based upon operative facts that were not already presented in the 2016 claims that are the subject of [the appeal]." *Avant Assessment, LLC*, ASBCA Nos. 61358, 61407, 61442 (Oct. 4, 2018) ("Avant's constructive acceptance and improper rejection claims are dismissed for lack of jurisdiction."). Avant now supplements its termination settlement proposal and offers, alternatively, a certified claim, to present these facts and arguments to the contracting officer.

### III.   Legal Argument

Avant is entitled to $5,216,815.86 as a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus $10,613 in charges that have resulted from the termination under FAR 52.212-4(l).[3] Avant is entitled to the $5,227,428.86 for the test items delivered to DLI, and retained by DLI, for which Avant never received payment.[4] Alternatively, Avant is entitled to recover $5,227,428.86 under FAR 52.212-4(a) and Uniform Commercial Code (UCC) Section 2-606(1) because DLI constructively accepted the test items.

#### A.   DLI Constructively Accepted the "Rejected" Items.

Avant is entitled to payment for the "rejected" items at the Contract Line Item rate because DLI constructively accepted the items through its exclusive ownership and control for the last six years.

When the Government attempts to reject a commercial item but subsequently takes actions inconsistent with the contractor's ownership rights, it has constructively accepted the item under Uniform Commercial Code (UCC) Section 2-606(1). *See, e.g., John C. Kohler Co. v. United States*, 204 Ct. Cl. 777, 788–89 (1974); *Mazur Bros. & Jaffe Fish Co., Inc.*, VABCA No. 512, 65-2 BCA ¶ 4,932 (June 1965); *Fischer Imaging Corp.*, VABCA No. 6125, 02-2 BCA ¶ 32,003 (Sept. 2002).

The most common form of implied acceptance is when the Government exhibits ownership and control over the purported "rejected" item. *See John C. Kohler Co.*, 204 Ct. Cl. at 788–89 (finding Government impliedly accepted boiler delivered by contractor under the UCC after agency took "custody of the boiler, [operated] the boiler for its own purposes for over 80 days, [selected its] employees to operate the boiler, [exercised] control over when the boiler was operated and for what periods . . ."); *Fischer Imaging Corp.*, VABCA No. 6125, 02-2 BCA ¶ 32,003 (finding Government impliedly accepted x-ray equipment under the UCC through its retention and continuous use of the equipment, performing several hundred procedures over the course of a year). The general legal consequence of acceptance is that the Government "must pay at the contract rate for the goods accepted." *See Mazur Bros. & Jaffe Fish Co., Inc.*,

---

[3]   Avant incurred an estimated $31,841 in legal fees associated with the preparation of the three claims now being submitted to the Contracting Officer. Those fees were divided equally among the three claims.

[4]   This figure is based off the Contract Line Item rate for the test items.

4

VABCA No. 512, 65-2 BCA ¶ 4,932 (finding contractor entitled to payment in full); see also UCC § 2-607(1) (effect of acceptance is that the buyer must pay the contract rate for any goods accepted).

Here, Avant delivered 8,080 items under Contract 0109, 4,906 of which the Government purported to "reject." DLI subsequently retained the items—for over five years now—and denied Avant the right to possess the "rejected" items or reuse them in any way. The Government retained these items pursuant to the Contract's language that gave the Government "sole ownership and exclusive rights to all deliverables[.]" (Contract 0109, p. 16.) The Government further prohibited Avant from retaining copies of any "contract deliverables or contract related materials following the delivery of contract deliverables to [the] Government" and from repurposing "any of these materials for future private, public, or commercial use." (Contract 0109, p. 17.) Taken together, the Government prohibited Avant from retaining or reusing any contract deliverables or contract related materials—including the "rejected" items—while the Government enjoyed exclusive ownership and use rights to Avant's detriment.

From the beginning of DLI's administration of the Contract, DLI operated with the motive that it would enjoy ownership rights to "all deliverables," including the "rejected" items, without formally "accepting" the items and paying Avant for them. In fact, DLI enjoyed these ownership rights and denied Avant any meaningful value in the form of compensation or return of the items. Given that many of the items were based on current affairs or political events at the time Avant created the items, the value of the actual item is now of significantly reduced value to Avant. Years ago, however, when the Government improperly terminated the Contract, the "rejected" items the items had actual value to Avant. Avant had other language test item contracts with federal agencies and non-governmental organizations. Had DLI returned the "rejected" items to Avant during the period of performance or at the terminations, Avant could have repurposed the items for other operations.

Value aside, the Government retained every deliverable Avant submitted for its own use and enjoyment without fair compensation to Avant. Like *Fischer Imaging Corp.*, where the agency impliedly accepted the x-ray equipment it retained for over a year after purportedly "rejecting" it and attempting to terminate the contract for cause, DLI similarly accepted the "rejected" items it retained them for over five years after attempting to terminate Avant's Contract for cause. The effect of DLI's acceptance is that DLI must pay for these test items under the authority of the UCC and the FAR. UCC Section 2-607(1) provides the effect of acceptance is that the buyer must pay the contract rate for the goods. *Mazur Bros. & Jaffe Fish Co., Inc.*, VABCA No. 512, 65-2 BCA ¶ 4,932.

  B. <u>The "Rejected" Items Met the Standard for Acceptance under FAR part 12.</u>

Avant is entitled to payment for the "rejected" items at the Contract Line Item rates because the submitted items met the standard for commercial acceptance. In soliciting for the acquisition of commercial items, FAR part 12 directs agencies to rely on a contractor's assurances that its product conforms to the contract requirements. *See, e.g.*, FAR 12.208 ("Contract for commercial items shall rely on contractors' existing quality assurance systems as a substitute for Government inspection and testing . . . "); FAR 12.402 ("The acceptance paragraph in 52.212-4 is based upon

5

the assumption that the Government will rely on the contractor's assurances that the commercial item tendered for acceptance conforms to the contract requirements.").

The "clear implication in the FAR" is that an agency, "by choosing to acquire an item by using commercial acquisition procedures foregoes the option to include detailed design or performance specifications and, instead, is to rely on the marketplace to meet its needs." *Fischer Imaging Corp.*, VABCA No. 6125, 02-2 BCA ¶ 32,003. When the Government includes detailed performance specifications that amount to additional acceptance criteria, it fails to act in a manner consistent with commercial practice. *Id.* This is especially so when the Government fails to identify any additional acceptance criteria as a supplement to the standard commercial item acceptance terms in FAR 52.212-4(a). *See id.* (finding agency's use of detailed specifications incorporated in the schedule of supplies as acceptance standards amounted to "specification by stealth" because the agency failed to identify the specifications as such). Absent a waiver, this is impermissible. *See* FAR 12.302 (requiring the Government to obtain a waiver when it acts inconsistent with commercial practice).

The acceptance standard for commercial items follows the general proposition that, in acquiring a commercial item, the Government has determined that an off-the-shelf commercial product meets its needs. FAR 52.212-4(a). The clause "reflects the policy expressed in the FAR that the Government should rely on contractor's quality assurance programs as is customary in the commercial market." *Fischer Imaging Corp.*, VABCA No. 6125, 02-2 BCA ¶ 32,003 (discussing FAR 12.402(a); see also FAR 46.202-1 ("When acquiring commercial items (see part 12), the Government shall rely on contractors' existing quality assurance systems as a substitute for Government inspection and testing . . . ").

Here, the Government solicited foreign language test items under the commercial item procedures in FAR Part 12. Through its use of FAR Part 12, the Government chose to forego the option to include detailed performance specifications and rely instead on the commercial market for items that would suit its needs. *See Fischer Imaging Corp.*, VABCA No. 6125, 02-2 BCA ¶ 32,003. While the Performance Work Statement stated the Government would review the passages and items (Contract 0109, p. 14), the Contract contained the standard acceptance terms in FAR 52.212-4(a) and nothing additional (*see* Contract 0109, p. 30). Regardless, DLI held Avant to an incredibly strict standard for acceptance—requiring perfection or near perfection in every aspect before deeming an item as "acceptable." As the agency did in *Fischer Imaging Corp.*, DLI identified one set of acceptance criteria in the Contract but in practice applied a different, previously undisclosed, ambiguous criteria that was far harsher.

Given DLI's "specification by stealth," while it maintained the illusion that it was conducting a normal off-the-shelf commercial item acquisition (see *Fischer Imaging Corp.*), the ambiguous guidance the Contract contained (*i.e.*, requiring items to be "acceptable" or "high quality" (Contract 0109, p. 14, 16), and the fact that reasonable experts may disagree about "acceptability," it is only reasonable to imply a material compliance or commercial acceptability standard. DLI seemingly recognized this in its "fixable items" policy, which provided an item was fixable when it "permits a new set of workable items." DLI concluded that if a ***passage*** was good or reasonable—"***workable***"—DLI reviewers should accept (and pay for) the item.

6

Notwithstanding this policy and notwithstanding the fact the Government, through its use of FAR Part 12, committed to accepting a typical commercial product, DLI imposed acceptance criteria beyond the standards for commercial acceptance. The Government cannot purport to acquire a "commercial item" under FAR Part 12—that envisions a Government buyer purchasing off-the-shelf items found in the commercial marketplace—and simultaneously expect strict compliance with "stealth" specifications as a precondition to "acceptance." This runs afoul of FAR Part 12. In essence, had DLI applied the appropriate commercially acceptability standard, those items that Avant submitted (all of which passed Avant's internal quality assurance system") would have been acceptable under DLI's "fixable" definition. But instead DLI rejected the items inappropriately. Avant is entitled to payment for these improperly "rejected" items as a percentage of the work it performed.

For the reasons set forth above, Avant is entitled to $5,216,815.86 as a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus $10,613 in charges that have resulted from the termination under FAR 52.212-4(l). Avant is entitled to these damages because DLI constructively accepted the test items. Avant asserts FAR 52.212-4(a) as an alternative basis for relief.

### IV.   Request for Relief

Avant seeks $5,227,428.86 in compensation for the "rejected" items DLI constructively accepted and/or that met the standard for acceptance.

### V.   Demand for Sum Certain

Avant demands the $5,227,428.86 plus prompt payment interest.

### VI.   Demand for Contracting Officer's Final Decision

Avant requests that a Contracting Officer's final decision be made within 60 days.

### VII.   Contractor's Certification

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Sincerely,

Avant Assessment, LLC

David Bong
CEO, Co-Founder
Avant Assessment, LLC
David.bong@avantassessment.com